**EXCELSIS LAW, P.C.**
ZAINAH ALFI (SBN 304164)
C. GENEVIEVE JENKINS (SBN 271128)
1000 Wilshire Blvd., Suite 600
Los Angeles, California 90017
Telephone:   213-340-0300
Facsimile:   213-340-0200
zalfi@excelsislaw.com

Attorneys for Plaintiff,
RAQUEL MEIRA DAVIS

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA – SACRAMENTO DIVISION

| | |
|---|---|
| RAQUEL MEIRA DAVIS, an individual, | **Case. No.** |
| Plaintiff, | **COMPLAINT FOR DAMAGES** |
| vs. | 1. **UNLAWFUL HARASSMENT IN VIOLATION OF THE FEHA – GOV'T CODE §§ 12940 *ET SEQ.*;** |
| MACUHEALTH DISTRIBUTION, INC.; FREDERIC JOUHET, an individual; and DOES 1-10, inclusive, | 2. **FAILURE TO PREVENT HARASSMENT IN VIOLATION OF THE FEHA – GOV'T CODE §§ 12940 *ET SEQ.*;** |
| Defendants. | 3. **UNLAWFUL RETALIATION IN VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964 – 42 U.S.C. § 2000e-3(a) *ET SEQ.*;** |
| | 4. **WRONGFUL TERMINATION IN VIOLATION OF PUBLIC POLICY;** |
| | 5. **BREACH OF CONTRACT; AND** |
| | 6. **WAITING-TIME PENALTIES PURSUANT TO LABOR CODE § 203.** |
| | **[DEMAND FOR JURY TRIAL]** |

Plaintiff Raquel Meira Davis ("Plaintiff") alleges as follows on knowledge as to herself and her known acts, and on information and belief as to all other matters:

## I.

## PARTIES

1. Defendant MacuHealth Distribution, Inc. (the "Company" or the "Defendant"), is a limited partnership registered and headquartered in Michigan.

2. Defendant Frederic Jouhet is a citizen of Michigan.

3. Plaintiff Raquel Meira Davis is a citizen of California.

4. At the relevant times mentioned herein, the Company was a limited partnership doing business in California.

5. At the relevant times mentioned herein, Plaintiff was employed by the Company and performed a majority of her work in California.

6. Plaintiff is ignorant of the true names and capacities of Defendants sued herein as DOES 1 through 10, inclusive, and therefore sues these Defendants by such fictitious names.  Plaintiff will amend this Complaint to allege the true names and capacities of said Defendants when the same has been ascertained.  Each of the fictitiously named Defendants is responsible in some manner for the acts complained of herein.  Unless otherwise stated, all references to named Defendants shall include DOE Defendants as well.

## II.

## JURISDICTION AND VENUE

7. Federal diversity jurisdiction exists pursuant to 28 U.S.C. section 1332 because Plaintiff is a citizen of a different state than the Defendants and because the value of the matter in controversy exceeds $75,000.

8. Venue in this district is proper pursuant to 28 U.S.C. section 1391 because a substantial part of the events or omissions on which the claim is based occurred in the Eastern District of California.

COMPLAINT FOR DAMAGES

9.      Venue in this district is also proper pursuant to California Labor Code section 925(a), which prohibits an employer from contractually requiring an employee who primarily resides and works in California to adjudicate a claim arising in California in a different State.  Plaintiff and Defendants entered into an employment agreement ("Employment Agreement" attached hereto as **Exhibit A**) in June 2015, and it was modified and/or extended annually through 2018.

### III.

### FACTUAL ALLEGATIONS

10.     MacuHealth Distribution, Inc. is a Company that manufactures and sells a nutraceutical supplement claiming to preserve and improve visual function.  The Company's headquarters are in Birmingham, Michigan, but it employs over twenty (20) people in more than twelve (12) states throughout the United States and in Canada.

11.     In or around May 2015, Plaintiff applied for the position of Sales Representative.  After her application was accepted, Plaintiff was interviewed by each of the following senior members of the Company: David Israel, who would become her direct supervisor, Jim Masciangelo, Chief Financial Officer, and Defendant Frederic Jouhet, Chief Executive Officer.

12.     During the phone interview with Defendant Jouhet, he informed Plaintiff that he was planning to expand the Company's market and sell product in Brazil, Plaintiff's country of origin.  He told Plaintiff this to persuade her to join the Company.  This disclosure influenced Plaintiff's decision to join the Company.

13.     On or about June 22, 2015, Plaintiff began her employment with MacuHealth.

14.     As part of Plaintiff's offer letter, provided by the Company, she was guaranteed a monthly car allowance, which was to be paid with her paycheck on a monthly basis.

COMPLAINT FOR DAMAGES

15.     In her capacity as Sales Representative, Plaintiff was responsible for selling MacuHealth products to doctors throughout her territory in Northern California, Nevada, and Hawaii.  Plaintiff moved from Salinas, California to Sacramento, California in order to be located more centrally within her territory.

16.     Plaintiff worked from her home and travelled to various doctors' offices, conferences, and vision-related expositions in her territory.

17.     Plaintiff saw other Company employees only sporadically at vision-related expositions, conferences, or planned meetings.

18.     For the duration of Plaintiff's employment with the Company, Plaintiff excelled at her job.  Plaintiff consistently met and exceeded the goals that were set for her, grew her territory, and received awards and recognition from the Company for her sales performance.

19.     For duration of Plaintiff's employment with the Company until her date of termination, Plaintiff was subjected to sexual harassment by Defendant Jouhet.

20.     Regularly, Defendant Jouhet made unwelcome and unsolicited sexual advances toward Plaintiff, as described herein.

21.     Defendant Jouhet frequently made inappropriate remarks to Plaintiff about her appearance, made inappropriate sexual comments about Plaintiff, and inquired into the details of Plaintiff's personal life, as described herein.

22.     Defendant Jouhet also regularly shared the details of his marital problems and impending divorce with Plaintiff.

23.     Plaintiff rebuffed Defendant Jouhet's advances, but felt that she could not be more aggressive in dismissing his advances without risking loss of her job – a job she needed (and Defendant Jouhet knew she needed) for financial purposes.  Nonetheless, Plaintiff clearly and consistently rebuffed Defendant Jouhet's sexual advances for the duration of her employment with the Company.

24.     Even while rebuffing Jouhet's advances, Plaintiff remained in good standing with Defendant Jouhet so long as she continued to engage him in a friendly manner.  Once Plaintiff realized that her polite rebuffs and maintenance of a friendly attitude toward Jouhet were insufficient to get him to leave her alone, however, she attempted to distance herself and make clearer to Jouhet that she was not going to engage in an extramarital affair with him.   Thereafter, Defendant Jouhet's interactions turned hostile and he instituted a series of reprisals that limited her growth within the Company and sabotaged her relationships with customers.

25.     On or about September 15, 2015, shortly after beginning her employment with the Company, Plaintiff met Defendant Jouhet in person for the first time at the Vision Expo West conference in Las Vegas, NV.  Many Company employees had flown to Las Vegas for the event.  On the way to dinner, after one of the Expo's events, Defendant Jouhet asked another sales representative to ride in a separate taxi so that Defendant Jouhet could ride alone with Plaintiff.

26.     In the taxi, Defendant Jouhet questioned Plaintiff about her personal life, told her she was beautiful and special, and also informed Plaintiff that he was separating from his wife.  At the dinner and afterwards, Defendant Jouhet continued to act inappropriately with Plaintiff, repeatedly touching her, and telling her how interested he was in her. Plaintiff informed Defendant Jouhet that he needed to stop as Jouhet had just informed her that he was married and she was not interested in his advances.

27.     Other sales representatives noticed Defendant Jouhet's advances and commented to Plaintiff about Jouhet's aggressive behavior.

28.     Plaintiff was embarrassed and concerned for her professional reputation, but believed that Defendant Jouhet's behavior would stop.

29.     The next time that Plaintiff saw Defendant Jouhet, on or about November 14, 2015, he continued to tell her how beautiful she looked.  He was very flirtatious with her in front of the other Company's employees present at the dinner.  Throughout the

evening, Defendant Jouhet repeatedly touched her shoulders, waist and legs, and stared at her for prolonged periods of time.  Plaintiff again objected to Defendant Jouhet's advances and asked him to stop.

30.    On or about November 16, 2015, Defendant Jouhet informed Plaintiff that she looked beautiful the night before and that it had taken everything in him not to touch her further.  Plaintiff reiterated that she was not interested in a romantic or physical relationship with Jouhet.

31.    From December 10, 2015 through early January 2016, Plaintiff travelled to Brazil to see her family for the holidays.

32.    Defendant Jouhet repeatedly contacted Plaintiff via Whatsapp messaging service for the duration of her personal vacation time.

33.    While Plaintiff was on vacation, Defendant Jouhet's messages to her were frequent and inappropriate, and included repeatedly calling her "Miss Brazil" and "princess," asking her to buy a bikini in his favorite color, commenting on her physical appearance, asking her for photos of herself, and complaining about the strained state of his marriage.

34.    For the duration of 2016, Defendant Jouhet continued to stay in frequent contact with Plaintiff, often stating that Plaintiff was "his" and regularly asking where she was and what she was doing.  These questions were never regarding work; rather, they were his attempts to maintain control of her and constantly know what she was doing – even on weekends.

35.    Throughout 2016, Defendant Jouhet invited Plaintiff to travel to be with him in cities such as Chicago and Hawaii.  Each time, Plaintiff declined.

36.    Defendant Jouhet developed a nickname for Plaintiff and referred to her as "little fish" in Portuguese.  He continued to use this nickname when they were alone or when communicating with her on the phone or by text message.

COMPLAINT FOR DAMAGES

37.     On or about June 22, 2016, Plaintiff had her one (1) year performance review with her direct supervisor, David Israel.  Plaintiff's territory, for which she was solely responsible for the duration of her employment with the Company, had a 125% increase in sales and was the Company's top-performing sales area in the United States.  As a result of her success in the region, Plaintiff was given a 3% raise in salary.

38.     Defendant Jouhet intermittently encouraged Plaintiff to work hard and informed Plaintiff that he recognized all her successes, but the majority of his communication with her was personal in nature.

39.     On or about October 5, 2016, Defendant Jouhet sent Plaintiff a text message asking her whether she ever considered purchasing a home.  When Plaintiff shared her hopes of buying a home near the beach, Defendant Jouhet informed her that if she ever found a home that she wanted, he would be willing to assist her financially in purchasing it.

40.     Defendant Jouhet verbally followed up on his offer with Plaintiff on several occasions.

41.     During a work trip to Hawaii and a personal trip to Brazil at the end of 2016, Defendant Jouhet repeatedly sent Plaintiff messages indicating that he wished he were with her and telling her how happy she made him.

42.     Defendant Jouhet informed Plaintiff that he enjoyed that he had to chase her.

43.     Defendant Jouhet's romantic pursuit of Plaintiff from 2017 onwards included, *inter alia*, sending Plaintiff messages containing photos and videos of himself, and consistently sending Plaintiff messages about her whereabouts.

44.     During this time period, Defendant Jouhet invited Plaintiff to join him in San Diego and also suggested renting a beach bungalow in Hawaii that they should share for three (3) months.  Plaintiff declined these offers.

45.     In February 2017, Plaintiff traveled to Arizona with several other Company employees including Mr. Israel and Defendant Jouhet.

46.     While in Arizona, Plaintiff and Defendant Jouhet had a private meeting where Plaintiff presented Defendant Jouhet with a business plan to distribute the Company's products in Brazil.  Defendant Jouhet had been mentioning his desire to do so since Plaintiff began working for the Company.  Defendant Jouhet had also suggested traveling to Brazil together to research the territory several times.

47.     In the meeting, which Defendant Jouhet made Plaintiff attend in a hotel room, Plaintiff was straightforward and professional, attempting, as always, to send a clear signal to Defendant Jouhet that she was not interested in his advances and wished to maintain a strictly professional relationship.

48.     After this meeting, Defendant Jouhet never again mentioned expanding the Company's reach into Brazil.  On information and belief, Defendant Jouhet had only been using the promise of expansion to Plaintiff's country of origin to entice her to work for him and to continue attempting to seduce her.

49.     Soon after the meeting, on or about February 5, 2017, Plaintiff informed some of her colleagues that she was dating someone.

50.     Later that same day, after discovering the existence of Plaintiff's boyfriend and following Plaintiff's clearly expressed desire to maintain a strictly professional relationship during their meeting, Defendant Jouhet began acting in a hostile manner towards Plaintiff.

51.     Thereafter, in many of his interactions with her, Defendant Jouhet became cold and unfriendly.

52.     Plaintiff feared for her position within the Company as a result of Defendant Jouhet's immediate change in demeanor.  Plaintiff did not act in any way to warrant such behavior.

53.     Defendant Jouhet repeatedly responded to Plaintiff's business inquiries and questions with curt, one-word answers.

54.     Plaintiff came to believe that Defendant Jouhet was sharing his hostility towards her with Plaintiff's supervisor, Mr. Israel.

55.     In or around May 2017, Mr. Israel notified Plaintiff that Defendant Jouhet was unhappy with her and threatened to terminate her employment.  Plaintiff was unsure how to react to that statement as she had been consistently working hard and performing well.  She pleaded with Mr. Israel to let her keep her job.

56.     On or about June 22, 2017, Plaintiff and Mr. Israel conducted a video conference call for Plaintiff's two (2) year performance review.  Plaintiff's territory was doing well and on target, but she was not given a raise.

57.     It was the Company's practice to offer a raise to sales representatives who met or exceeded their sales targets.  Plaintiff was not given a raise because Defendant Jouhet was retaliating against her for rebuffing his advances and because he was hoping she would quit.

58.     Subsequent to her two (2) year performance review, Plaintiff changed her sales strategy and her territories began to experience tremendous growth.

59.     In or around June 2018, Plaintiff and Mr. Israel met for Plaintiff's three (3) year performance review.  On information and belief, Plaintiff's territory (and, therefore, Plaintiff) was again performing the best in the nation.  Plaintiff, however, was not given a raise for the second year in a row.

60.     Plaintiff was not given a raise in spite of her evident and consistent accomplishments because Defendant Jouhet was retaliating against her for rebuffing his advances and because he was hoping she would quit.

61.     In or around July 2018, when the Company and its employees, including Defendant Jouhet, travelled to Europe, Plaintiff did not go out dancing or drinking with the other employees.  These activities were non-work activities and Plaintiff was not required to attend them.

62.     Nonetheless, Defendant Jouhet made known to Plaintiff his displeasure about Plaintiff's being "distant" and not participating in the after-hours celebrations.

63.     As Defendant Jouhet's hostility continued, Plaintiff came to believe that, despite her excellent performance, her job security was under threat.  She perceived that she was no longer being given the same opportunities for growth as she previously had.

64.     Plaintiff feared that her employment was going to be terminated at any moment.

65.     Shortly thereafter, on or about July 31, 2018, Plaintiff received an email stating that the car allowances that were usually included in sales representatives' paychecks had not being included, but that, instead, e-checks for the car allowances had been distributed to all Company employees.

66.     Plaintiff never received her car allowance via e-check or any other method.

67.     Again in September 2018, Plaintiff did not receive her car allowance via e-check or other method.

68.     The Company intentionally did not pay Plaintiff her owed wages in order to make her feel insecure about her job and to create circumstances that would force her to quit.

69.     On or about August 3, 2018, Plaintiff attempted to speak to Defendant Jouhet about her job security and whether she was being pushed out.  Defendant Jouhet refused to speak to her.

70.     In or around August 2018, Plaintiff received several phone calls from her clients, including various doctors and organizations, informing her that the Company had not issued payments for sponsorships and other funds that Plaintiff had promised on the Company's behalf.

71.     Prior to this, for at least the three (3) years Plaintiff had been working for the Company, the Company had never missed or been late for a payment that Plaintiff

1   requested.  There was no financial reason for the Company's late or missed payments in
2   August 2018.

3       72.     Defendant Jouhet and/or other managing agents of the Company were
4   attempting to sabotage Plaintiff's work and undermine her ability to succeed in her work.
5   This was done in an effort to make Plaintiff quit.

6       73.     Plaintiff had no one to speak with about the Company's actions because the
7   Company did not have a human resources department, Defendant Jouhet had refused to
8   speak with her, and Mr. Israel acted as though nothing was happening.

9       74.     On or about August 23, 2018, as a result of the Company's efforts to
10  undermine her ability to work, Plaintiff called Defendant Jouhet to inform him that she
11  would be resigning and provided the Company's required thirty (30) days' notice.
12  Plaintiff felt forced to quit and as though she had no other option.

13      75.     Later in the day on or about August 23, 2018, Mr. Israel emailed Defendant
14  Jouhet and Plaintiff requesting that Plaintiff submit her resignation in writing.

15      76.     On or about August 24, 2018, Plaintiff responded to Mr. Israel's email
16  stating that while she enjoyed her job tremendously, she had been struggling with many
17  things that had been taking place at work and she felt isolated.  Plaintiff informed Mr.
18  Israel and Defendant Jouhet that she felt "intimidated," "disrespected," and pushed into a
19  position where she felt she had no option but to quit.

20      77.     In this same email, Plaintiff rescinded her resignation in writing and
21  informed Mr. Israel and Defendant Jouhet that she simply needed to take two weeks off
22  in order to clear her head and recover emotionally.

23      78.     On or about Saturday, August 25, 2018, Defendant Jouhet emailed Plaintiff
24  at about 9:00 am asking to set up a call within the hour.  Because it was a weekend,
25  Plaintiff was unavailable to speak on that day.

26
27
28

COMPLAINT FOR DAMAGES

79.     On or about Monday, August 27, 2018, Plaintiff emailed Defendant Jouhet and Mr. Israel.  She apologized for being unavailable over the weekend and attempted to reschedule a call at a time that was convenient for all of them.

80.     Mr. Israel promptly responded that the Company had accepted her verbal resignation and informed her how she should return the Company's property that was in her possession.  Mr. Israel instructed her not to continue working for the Company and made her resignation effective immediately.

81.     Plaintiff did not agree to resign and had rescinded her resignation.  Mr. Israel and Defendant Jouhet terminated Plaintiff's employment.

82.     As a result of what she endured while employed by the Company and the circumstances surrounding her termination, Plaintiff suffered from emotional distress in the months after her employment was terminated, and ultimately sought medical care.

83.     The Company's conduct, as described above, was performed or ratified by managing agents, including, but not limited to, Frederic Jouhet, David Israel, and Jim Masciangelo (collectively, the "Managing Agents").  The Managing Agents were each responsible for overseeing a substantial portion of the Company's operations, and each exercised substantial discretionary authority over vital aspects of such operations, including making significant decisions that affected the Company's internal policies.  The Managing Agents engaged in malicious, fraudulent, and oppressive conduct that justifies an award of punitive damages.

84.     In committing the acts as set forth above, the Managing Agents acted despicably and subjected Plaintiff to cruel and unjust hardship in conscious disregard for her rights under California and Federal law.  By way of example, Managing Agent Jouhet engaged in severe and pervasive harassment of Plaintiff based on Plaintiff's sex.  After Plaintiff rebuffed him and it became clear to Jouhet that Plaintiff was not going to pursue a romantic relationship with him, he retaliated against Plaintiff.  Managing Agent Jouhet and/or the other Managing Agents working under his direction, retaliated against Plaintiff

in order to force her to quit, thereby constructively terminating her employment.  The Managing Agents' conduct demonstrates a callous indifference for the law and Plaintiff's rights.

85.     In committing the foregoing acts as set forth above, the Managing Agents intended to cause emotional injury to Plaintiff.  Among other things, the Managing Agents harassed Plaintiff and terminated her employment with the intent to cause her severe emotional distress or at least without regard for the consequences on Plaintiff's career, livelihood, and her emotional well-being.

## IV.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

86.     Prior to the filing of this lawsuit, Plaintiff filed a complaint against each named Defendant with the California Department of Fair Employment and Housing ("DFEH") pursuant to section 12900 *et seq.* of the California Government Code, alleging the claims described in this Complaint.  On June 18, 2019, the DFEH issued a "right to sue" letter to Plaintiff.  A true and correct copy of the right-to-sue letter obtained from the DFEH is attached hereto as **Exhibit B**.  All conditions precedent to the institution of this lawsuit have been fulfilled.  This action is filed within one year of the date that the DFEH issued its right-to-sue letter.

87.     Prior to the filing of this lawsuit, Plaintiff filed a complaint against each named Defendant with the Equal Employment Opportunity Commission (the "EEOC"), alleging the claims described in this Complaint.  On July 1, 2019, the EEOC issued a "right to sue" letter to Plaintiff.  A true and correct copy of the right-to-sue letter obtained from the DFEH is attached hereto as **Exhibit C**.  All conditions precedent to the institution of this lawsuit have been fulfilled.  This action is filed within ninety (90) days of the date that the EEOC issued its right-to-sue letter.

COMPLAINT FOR DAMAGES

# V.

## FIRST CAUSE OF ACTION

### (Unlawful Harassment in Violation of the FEHA)

### (On Behalf of Plaintiff Against All Defendants)

88.     Plaintiff re-alleges and incorporates by reference paragraphs 1-86, inclusive, of this Complaint as though fully set forth herein.

89.     California Government Code section 12940(j) makes it illegal for an employer or any person to harass an employee because of his or her sex and/or gender.

90.     During the course of Plaintiff's employment with the Company, Plaintiff was harassed on the basis of her sex and/or gender by the Company's CEO, Defendant Jouhet.

91.     Defendant Jouhet engaged in a pattern of continuous and pervasive harassment of Plaintiff based on her sex, which included, *inter alia*, unwanted sexual advances, harassing messages and phone calls, and inappropriate touching of Plaintiff's body.

92.     For so long as Plaintiff continued to engage Defendant Jouhet in a friendly manner, she was supported at work, recognized and rewarded for her accomplishments, and given opportunities to attend various conferences and meet with doctors.

93.     When it became clear to Defendant Jouhet that Plaintiff had a boyfriend and was not going to acquiesce to his advances, Defendant Jouhet created a hostile work environment by implementing a series of reprisals including, *inter alia*, withholding Plaintiff's salary raises despite her excellent performance, withholding Plaintiff's car allowance, sabotaging Plaintiff's relationships with her customers, and sending her a clear message that she would no longer be allowed to succeed at the Company.

94.     At the relevant times mentioned herein, Defendant Jouhet was a "supervisor" within the meaning of California Government Code section 12926(r) because he had the authority, in the interest of the Company, "to hire, transfer, suspend, lay-off, recall, promote, discharge, assign, reward, or discipline other employees, or the responsibility to

direct them, or to adjust their grievances, or to effectively recommend that action," and in connection with the foregoing was required to use independent judgment. Because Defendant Jouhet was a supervisor as defined by the FEHA, the Company is strictly liable for his acts of harassment.

95.    As a proximate result of the Company's, and Defendant Jouhet's conduct, Plaintiff suffered and continues to suffer damages in terms of lost wages, lost bonuses, lost benefits, and other pecuniary loss according to proof. Plaintiff has also suffered and will continue to suffer physical and emotional injuries, including nervousness, humiliation, depression, anguish, embarrassment, fright, shock, pain, discomfort, fatigue, and anxiety. The amount of Plaintiff's damages will be ascertained at trial.

96.    The Company's conduct, as described above, was performed or ratified by Managing Agents. The Managing Agents were each responsible for overseeing a substantial portion of the Company's business operations, and each exercised substantial discretionary authority over vital aspects of such operations including making significant decisions that affect the Company's internal policies. The Managing Agents engaged in malicious, fraudulent, and oppressive conduct that justifies an award of punitive damages.

97.    In committing the foregoing acts, as set forth above, the Managing Agents willfully disregarded Plaintiff's right to be free from unlawful harassment based in part on her sex. Among other things, Defendant Jouhet engaged in a pattern of unwanted, unprofessional and sexualized behavior and commentary towards Plaintiff. David Israel and Jim Masciangelo, both Managing Agents, supported and carried out Defendant Jouhet's reprisals against Plaintiff when Defendant Jouhet wanted her to be punished.

98.    In committing the foregoing acts as set forth above, the Managing Agents acted despicably and subjected Plaintiff to cruel and unjust hardship in conscious disregard for her rights under California law. By way of example, the Managing Agents intentionally caused Plaintiff harm by engaging in and allowing a years-long pattern of harassment of Plaintiff to occur and implementing a series of reprisals that undermined

Plaintiff's abilities to succeed when Defendant Jouhet was upset by Plaintiff's decision to draw clear boundaries in their professional relationship.  The Managing Agents' behavior demonstrates a callous indifference for the law and Plaintiff's rights.

99.    In committing the foregoing acts as set forth above, the Managing Agents intended to cause emotional and financial injury to Plaintiff.  Specifically, the Managing Agents have harassed Plaintiff and/or permitted a campaign of harassment to continue unchecked with the intent to cause Plaintiff severe emotional distress or at least without regard for the consequences on Plaintiff's career, livelihood, and her emotional well-being.

100.   The FEHA provides for an award of reasonable attorneys' fees and costs incurred by a prevailing plaintiff in an action brought under its provisions.  Plaintiff has employed and will continue to employ attorneys for the initiation and prosecution of this action.  Plaintiff has incurred and will continue to incur attorneys' fees and costs herein.  Plaintiff is entitled to an award of attorneys' fees and costs.

101.   Plaintiff has been generally damaged in an amount within the jurisdictional limits of this Court.

## VI.

## SECOND CAUSE OF ACTION

### (Failure to Prevent Harassment in Violation of the FEHA)

### (On Behalf of Plaintiff Against the Company)

102.   Plaintiff re-alleges and incorporates by reference paragraphs 1-86, inclusive, of this Complaint as though fully set forth herein.

103.   California Government Code section 12940(k) makes it an unlawful employment practice for an employer to "fail to take all reasonable steps to prevent discrimination and harassment from occurring."  The Company violated this provision by failing to prevent harassment against Plaintiff.  Specifically, the Company knew or should

have known of the harassment against Plaintiff yet failed to take any prompt remedial action.

104.   Defendant Jouhet, a Managing Agent, was the perpetrator of the harassment. Several of the Company's other Managing Agents including Jim Masciangelo and David Israel witnessed the harassment and failed to take appropriate action to prevent further harassment.  Not only did the Company's management fail to prevent further harassment from occurring, but Managing Agents Israel and Masciangelo exacerbated this illegal and harmful treatment by, *inter alia*: passing along messages to Plaintiff when Defendant Jouhet was upset with her, failing to give her a raise in salary at her performance reviews for two (2) consecutive years despite her excellent performance, failing to reimburse her for her car payments in July and August 2018, and undermining her relationships with customers and business partners.

105.   As a proximate result of the Company's conduct, Plaintiff suffered and continues to suffer damages in terms of lost wages, lost benefits, and other pecuniary loss according to proof.  Plaintiff has also suffered and will continue to suffer physical and emotional injuries, including nervousness, humiliation, depression, anguish, embarrassment, fright, shock, pain, discomfort, fatigue, and anxiety.  The amount of Plaintiff's damages will be ascertained at trial.

106.   The Company's conduct, as described above, was performed or ratified by the Managing Agents of the Company, who engaged in malicious, fraudulent, and oppressive conduct that justifies an award of punitive damages.

107.   In committing the foregoing acts as set forth above, the Managing Agents willfully disregarded Plaintiff's right to be free from harassment and retaliation.  Among other things, the Managing Agents failed to take any action to stop Defendant Jouhet's sexualized and unprofessional behavior, withheld salary increases and wages from her, and ultimately terminated her employment despite knowing about the sexual harassment and hostile work environment that she had been subjected to.

COMPLAINT FOR DAMAGES

108.   In committing the foregoing acts as set forth above, the Managing Agents acted despicably and subjected Plaintiff to cruel and unjust hardship in conscious disregard for her rights under California law.  By way of example, the Managing Agents intentionally caused Plaintiff harm by being complicit in Defendant Jouhet's harassing behavior and implementing his reprisals when Defendant Jouhet was upset with her for personal reasons.  The Managing Agents' conduct demonstrates a callous indifference for the law and Plaintiff's rights.

109.   In committing the foregoing acts as set forth above, the Managing Agents intended to cause emotional and financial injury to Plaintiff.  Specifically, the Managing Agents have permitted years of harassment to continue unchecked with the intent to cause Plaintiff severe emotional distress or at least without regard for the consequences on Plaintiff's career, livelihood, and her emotional well-being.

110.   The FEHA provides for an award of reasonable attorneys' fees and costs incurred by a prevailing plaintiff in an action brought under its provisions.  Plaintiff has employed and will continue to employ attorneys for the initiation and prosecution of this action.  Plaintiff has incurred and will continue to incur attorneys' fees and costs herein. Plaintiff is entitled to an award of attorneys' fees and costs.

111.   Plaintiff has been generally damaged in an amount within the jurisdictional limits of this Court.

## VII.

## THIRD CAUSE OF ACTION

### (Unlawful Retaliation in Violation of Title VII)

### (On Behalf of Plaintiff Against all Defendants)

112.   Plaintiff re-alleges and incorporates by reference paragraphs 1-86, inclusive, of this Complaint as though fully set forth herein.

113.   Title VII of the Civil Rights Act of 1964, as amended by the Civil Rights Act of 1991 (42 U.S.C. §2000e), forbids an employer from retaliating against an employee

because of the employee's opposition to "any practice made an unlawful practice" by Title VII, or the employee's participation in "an investigation, proceeding, or hearing under [Title VII]." 42 U.S.C. § 2000e-3(a).  Sexual harassment is an unlawful practice under Title VII; Plaintiff's resistance to Defendant Jouhet's sexual advances was a clear effort to oppose such practice.  As a result of her resistance, Plaintiff was retaliated against by the Company.

114.   For the duration of her employment with the Company, Plaintiff was subjected to unwanted physical touching, sexual advances, and persistent attempts by Defendant Jouhet to engage in a romantic relationship with him as a result of Plaintiff's sex.  The conduct was not welcomed by Plaintiff and was never reciprocated.

115.   Plaintiff's endurance of Defendant Jouhet's conduct was an implied condition for receiving a continual recognition for her excellent performance, salary increases as a result of her job performance, opportunities to attend various industry events, and job security within the Company.  After Plaintiff rebuffed Defendant Jouhet's advances and made clear to him that their relationship was to remain strictly professional, she experienced a series of reprisals.

116.   These included, but were not limited to, withholding Plaintiff's salary raises despite her excellent performance, withholding Plaintiff's car allowance, sabotaging Plaintiff's working relationships with her customers, and sending her a clear message that she would no longer be allowed to succeed at the Company.

117.   Further, when Plaintiff attempted to explain to Defendant Jouhet and Mr. Israel that she had been under an immense amount of stress due to circumstances at work and requested two (2) weeks to recover emotionally, the managing agents denied her a reasonable accommodation and terminated her employment.

118.   As a proximate result of the Company's and Defendant Jouhet's conduct, Plaintiff suffered and continues to suffer damages in terms of lost wages, lost bonuses, lost benefits, and other pecuniary loss according to proof.  Plaintiff has also suffered and

will continue to suffer physical and emotional injuries, including nervousness, humiliation, depression, anguish, embarrassment, fright, shock, pain, discomfort, fatigue, and anxiety.  The amount of Plaintiff's damages will be ascertained at trial.

119.   The Company's conduct, as described above, was performed or ratified by Managing Agents.   The Managing Agents were each responsible for overseeing a substantial portion of the Company's business operations, and each exercised substantial discretionary authority over vital aspects of such operations including making significant decisions that affect the Company's internal policies.  The Managing Agents engaged in malicious, fraudulent, and oppressive conduct that justifies an award of punitive damages.

120.   In committing the foregoing acts, as set forth above, the Managing Agents willfully disregarded Plaintiff's right to be free from unlawful retaliation for declining to engage in a romantic or sexual relationship with Defendant Jouhet.  Among other things, Defendant Jouhet retaliated against Plaintiff after she made clear to him that she was not interested in pursuing a romantic relationship with him.   David Israel and Jim Masciangelo, both Managing Agents, supported and carried out Defendant Jouhet's reprisals against Plaintiff when Defendant Jouhet wanted her to be punished.

121.   In committing the foregoing acts as set forth above, the Managing Agents acted despicably and subjected Plaintiff to cruel and unjust hardship in conscious disregard for her rights under federal law.  By way of example, the Managing Agents retaliated against Plaintiff by implementing a series of reprisals against her, refused to speak with her about what was taking place with Defendant Jouhet, and ultimately terminating her employment.  The Managing Agents' behavior demonstrates a callous indifference for the law and Plaintiff's rights.

122.   In committing the foregoing acts as set forth above, the Managing Agents intended to cause emotional and financial injury to Plaintiff.  Specifically, the Managing Agents permitted a years-long pattern of harassment to continue unchecked with the intent

to cause Plaintiff severe emotional distress or at least without regard for the consequences on Plaintiff's career, livelihood, and her emotional well-being.

123.    Title VII provides for an award of reasonable attorneys' fees and costs incurred by a prevailing plaintiff in an action brought under its provisions.  Plaintiff has employed and will continue to employ attorneys for the initiation and prosecution of this action.  Plaintiff has incurred and will continue to incur attorneys' fees and costs herein. Plaintiff is entitled to an award of attorneys' fees and costs.

124.    Plaintiff has been generally damaged in an amount within the jurisdictional limits of this Court.

## VIII.

## FOURTH CAUSE OF ACTION

### (Wrongful Termination in Violation of Public Policy)

### (On Behalf of Plaintiff Against the Company)

125.    Plaintiff re-alleges and incorporates by reference paragraphs 1-86, inclusive, of this Complaint as though fully set forth herein.

126.    As detailed above, Plaintiff experienced harassment by the Company's CEO, Defendant Jouhet, for years.  The Company did not have a human resources department for her to reach out to in order to discuss the ongoing harassment by the most powerful member of the Company.  Ultimately, after Plaintiff had made clear that she would not enter into a romantic or sexual relationship with Jouhet, the Company's Managing Agents intentionally and knowingly permitted Jouhet's retaliatory behavior to continue unchecked, limited Plaintiff's earning potential, failed to pay her owed wages, and undermined the relationships that she had built with doctors and customers.  The working conditions created by the Company and its Managing Agents were part of a continuous pattern of mistreatment of Plaintiff.

127.   The Managing Agents created working conditions that were intolerable to Plaintiff and would have been intolerable to a reasonable person.   Plaintiff had no reasonable alternative but to resign.

128.   Based on these working conditions, Plaintiff verbally informed Jouhet that she was resigning.   When Mr. Israel asked for a written resignation, Plaintiff did not provide it, however, and instead asked Defendant Jouhet and Mr. Israel to allow her to take a leave of absence.

129.   Rather than permitting Plaintiff to take a leave of absence, which may have mitigated the working conditions created by the Company's Managing Agents, the Company terminated her employment in opposition to fundamental and well-established public policies, as set forth in various statutes, including, but not limited to, Title VII and the FEHA.

130.   Although Plaintiff attempted to rescind her verbal resignation, the Company did not allow her to do so.   By framing Plaintiff's departure as a resignation, rather than a termination, the Company also deprived Plaintiff of the opportunity to receive unemployment benefits after she left the Company.

131.   As a proximate result of the Company's misconduct, Plaintiff suffered and continues to suffer damages in terms of lost wages, lost benefits, and other pecuniary loss according to proof.   Plaintiff has also suffered and will continue to suffer physical and emotional injuries, including difficulty sleeping, nervousness, humiliation, depression, anguish, embarrassment, fright, shock, pain, discomfort, fatigue, and anxiety.   The amount of Plaintiff's damages will be ascertained during trial.

132.   The Company's conduct, as described above, was performed or ratified by the Managing Agents, who engaged in malicious, fraudulent, and oppressive conduct that justifies an award of punitive damages.

133.   In committing the foregoing acts as set forth above, the Managing Agents willfully disregarded Plaintiff's right to be free from harassment in violation of the FEHA and Title VII.

134.   In committing the foregoing acts as set forth in above, the Managing Agents acted despicably and subjected Plaintiff to cruel and unjust hardship in conscious disregard for her rights under California and Federal law.  For example, the Managing Agents intentionally caused Plaintiff harm by being complicit in Defendant Jouhet's harassing behavior and implementing his reprisals when Defendant Jouhet was dissatisfied with her conduct with him.  The Managing Agents' behavior demonstrates a callous indifference for the law and Plaintiff's rights.

135.   In committing the foregoing acts as set forth above, the Managing Agents intended to cause emotional and financial injury to Plaintiff.  Specifically, Defendant Jouhet engaged in a pattern of unwanted, unprofessional and sexualized behavior and commentary towards Plaintiff.  David Israel and Jim Masciangelo, both Managing Agents, supported and carried out Defendant Jouhet's reprisals against Plaintiff when Defendant Jouhet wanted her to be punished; these actions ultimately led to her termination.

136.   Plaintiff has been generally damaged in an amount within the jurisdictional limits of this Court.

## IX.

## FIFTH CAUSE OF ACTION

### (Breach of Contract)

### (On Behalf of Plaintiff Against All Defendants)

137.   Plaintiff realleges and incorporates by reference paragraphs 1-86, inclusive, of this Complaint as though fully set forth herein.

138.   As alleged herein, Plaintiff received an Offer Letter, which outlined the

details of her compensation by the Company.  The letter was signed by both David Israel and Plaintiff.  In the Letter, Plaintiff was to receive an automobile allowance from the Company every month.  See **Exhibit D** attached hereto.

139.   Plaintiff normally received her automobile allowance along with her paycheck.

140.   On or about July 31, 2018, Company CFO, Jim Masciangelo, emailed the Company's employees and informed them that the allowances had not been included with their paychecks, but that an e-check would be issued to everyone.

141.   On information and belief, every other Company employee received their automobile allowance for July 2018 by e-check.

142.   Due to Defendant Jouhet's personal feelings towards Plaintiff and his desire to push Plaintiff out of the Company, Plaintiff was not given her automobile allowance for July 2018 or September 2018 in breach of her Contract with the Company.

143.   Plaintiff was harmed by the Company's breach of the Offer Letter.

144.   Defendants' breach of the Offer Letter was a substantial factor in causing Plaintiff's harm.

145.   Plaintiff has been generally damaged in an amount to be determined at trial, but which amount is within the jurisdictional limits of this Court.

146.   Plaintiff relied to her detriment on the Company's promises and was not reimbursed for the use of her vehicle for the months of July and September 2018.

147.   Plaintiff has been generally damaged in an amount to be determined at trial, but which amount is within the jurisdictional limits of this Court.

//

# X.

## SIXTH CAUSE OF ACTION

### (Waiting-Time Penalties Pursuant to Labor Code § 203)

### (On Behalf of Plaintiff Against Defendants)

148.   Plaintiff re-alleges and incorporates by reference paragraphs 1-86, inclusive, of this Complaint as though fully set forth herein.

149.   Labor Code section 201 states, "If an employer discharges an employee, the wages earned and unpaid at the time of discharge are due and payable immediately." Pursuant to Labor Code section 202, "[i]f an employee not having a written contract for a definite period of time quits his or her employment, his or her wages shall become due and payable not less than 72 hours thereafter, unless the employee has given 72 hours previous notice of his or her intention to quit, in which case the employee is entitled to his or her wages at the time of quitting."

150.   The Company failed to pay Plaintiff the amount owed to her on the date of her termination.  Plaintiff has still not received her automobile reimbursement for the months of July and September 2018.

151.   Labor Code section 203 states, "If an employer willfully fails to pay... any wages of an employee who is discharged or who quits, the wages of the employee shall continue as a penalty from the due date thereof at the same rate until paid or until an action therefor is commenced; but the wages shall not continue for more than 30 days."

152.   The Defendants' willful failure to pay Plaintiff's earned wages entitles Plaintiff to waiting-time penalties pursuant to Labor Code section 203, in the amount of her daily wages for each day unpaid, up to 30 days.

153.   Plaintiff has been generally damaged in an amount within the jurisdictional limits of this Court.

//

# XI.

## PRAYER FOR RELIEF

1.      For general damages, including emotional distress damages, according to proof on each cause of action for which such damages are available.

2.      For special damages, according to proof on each cause of action for which such damages are available.

3.      For compensatory damages, including emotional distress damages, according to proof on each cause of action for which such damages are available.

4.      For punitive damages against Defendants, according to proof on each cause of action for which such damages are available.

5.      For declaratory and injunctive relief, as appropriate.

6.      For prejudgment interest and post-judgment interest according to law.

7.      For reasonable attorneys' fees incurred in this action pursuant to the FEHA and Title VII.

8.      For costs of litigation incurred in this action.

9.      For such other and further relief that the Court deems proper and just.

As to the Sixth Cause of Action for Waiting-Time Penalties

10.      For waiting time penalties pursuant to California Labor Code § 203.


Dated: September 24, 2019          EXCELSIS LAW, P.C.

                                   By _____
                                      ZAINAH ALFI
                                      C. GENEVIEVE JENKINS


                                   Attorneys for Plaintiff,
                                   RAQUEL MEIRA DAVIS

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## **DEMAND FOR JURY TRIAL**

Plaintiff RAQUEL MEIRA DAVIS hereby demands a trial by jury on all causes of action alleged herein in the Complaint for Damages.

Dated: September 24, 2019     EXCELSIS LAW, P.C.

By: _____
    ZAINAH ALFI
    C. GENEVIEVE JENKINS

Attorneys for Plaintiff,
RAQUEL MEIRA DAVIS

**Exhibit A**

## EMPLOYMENT AGREEMENT

This Employment Agreement ("Agreement") made as of the 22nd day of June, 2015 (the "Effective Date"), by and between **MACUHEALTH DISTRIBUTION, INC.**, a Michigan corporation (hereinafter referred to as "Company") and Raquel Davis (Meira), whose address is ███████████████████████████ hereinafter referred to as "(Employee")

**WHEREAS**, Company is engaged in the sale and distribution of certain patented supplements for the prevention of age-related macular degeneration and other products for eye health (hereinafter referred to as "Products") as further defined in **Exhibit A**; and

**WHEREAS**, Employee desires to be appointed as a Sales Representative for the Products in the Territory, as defined in **Exhibit B**, upon the terms and conditions set forth herein; and

**WHEREAS**, Company is willing to appoint Employee as its Sales Representative for the Products in the Territory upon the terms and conditions as set forth herein.

**NOW, THEREFORE**, in consideration of the mutual promises and covenants contained herein and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto agree as follows:

1.    **Appointment**. Company hereby appoints Employee as its Sales Representative to solicit sales for its Products for customers located in the Territory and Employee hereby accepts such appointment, in accordance with the terms and conditions set forth herein. In consideration of this employment, Employee hereby agrees to exert his/her best efforts during the term of this Agreement to vigorously promote the sale of the Products in the Territory.

2.    **Term**. The employment of the Employee, pursuant to this Agreement, shall commence on the date first written above and shall continue on a year-to-year basis unless and until terminated as provided for in this Agreement.

3.    **Compensation and Benefits**. The Employee's compensation and benefits will be as set forth in **Exhibit C** and shall be attached hereto and made a part of this Agreement as more specifically set forth herein. All payments made by the Company to Employee pursuant to the terms of this Agreement, shall be subject to all applicable federal, state and local withholding, payroll and other similar taxes. Company hereby reserves the right, in its sole discretion, to modify the Commission Plan as set forth in Exhibit C. In any event, compensation and benefits shall be reviewed on an annual basis and any modifications shall be set forth in Exhibit C.

4.    **Non-Disclosure, Intellectual Property, and Inventions**:

(a)    The Employee acknowledges that the Confidential Information (defined below) relating to the business of the Company that the Employee will obtain during the course of his/her employment by the Company and his/her performance under this Agreement are the property of the Company. The Employee agrees that he/she will not disclose or use at any time

RD Initial

any Confidential Information, other than in the ordinary course of business of the Company to promote the interests of and pursuant to the Company's policy, without the prior written consent of the Company. The Employee agrees to deliver to the Company at the end of his/her employment, or at any other time that the Company may request, all memoranda, notes, plans, records, diskettes, tapes, and other storage media, documentation, and other materials (and copies thereof) containing Confidential Information relating to the business of the Company, no matter where such material is located and no matter what form the material may be in, that the Employee may then possess or have under his/her control. If requested by the Company, the Employee shall provide to the Company written confirmation that all such materials have been delivered to the Company or have been destroyed. The Employee shall take all appropriate steps to safeguard Confidential Information and to protect it against disclosure, misuse, espionage, loss, and theft.

(b)     For purposes of this Agreement, "Confidential Information" shall mean trade secrets, confidential or proprietary information, and all other knowledge, know-how, information, documents, or materials owed, developed, or possessed by the Company, whether in tangible or intangible form, pertaining to the business of the Company or any customer thereof, known or intended to be known only to employees of the Company or other persons in a confidential relationship with the Company, including but not limited to marketing and advertising plans, research and development data, project data, assignments of individual employees, testing and evaluation procedures, cost data and techniques, data bases, designs, models, operating procedures, knowledge of the organization (including pricing and sales policies, techniques, and concepts), trade shows (including prices, costs, sales, or content), details of joint venture or sponsorship agreements, knowledge of strategic or marketing plans for future events, direct marketing, promotion strategies and plans, marketing strategies and plans, shows, conferences or publications, processes, techniques, contracts, financial information or measures, business methods, future business plans, package design, retail design, field marketing outsourcing, customers (including identities of customers and prospective customers, identities of individual contacts as business entities that are customers or prospective customers, preferences, businesses, or habits), personnel and employee files and records, business relationships, training/seminars, and other information owned, developed, or possessed by the Company; provided, however, that Confidential Information shall not include (i) information which, prior to the time of disclosure by the Company, was known to the Employee as evidenced by his/her written records, (ii) information that, at the time of disclosure to the Employee, was published or known publicly or was otherwise in the public domain, (iii) information which, after disclosure to the Employee, is published or becomes publicly known or otherwise becomes part of the public domain other than as a result of a breach of this Agreement, or (iv) information which is disclosed to the Employee in good faith by a third party who is not under obligation of confidence or secrecy to the Company at the time such third party discloses the information to the Employee.

5.     **Covenant Not to Compete**. Employee agrees that for so long as he/she is employed by the Company, Employee shall not, for any reason whatsoever, directly or indirectly solicit, seek, accept employment, or accept orders, for his/her own account or for the account of others for services which compete with the Company within the or to or on behalf of any of the persons or businesses which the Company conducts business and which provides services as of

RD

the date of this Agreement or the date upon which such Employee's interest terminates. Employee acknowledges that a violation of the provisions of this section will cause irreparable injury to the Company and that there is no adequate remedy at law for such violation, and Employee therefore agrees that the Company shall have the right, in addition to any other remedies available to it, at law or in equity, to immediately enjoin the violating Employee, as the case may be, upon application to a court of competent jurisdiction for the issuance of an *ex-parte* restraining order, preliminary injunction or permanent injunction prohibiting such person from violating this provision.

6.      **Termination**.  Employee's employment and this Agreement may be terminated at any time in the following ways:

(a)      Termination Due to Employee's Death or Disability.  Employee's employment and this Agreement will terminate if Employee dies or suffers physical incapacity or mental incompetence. For the purpose of this Agreement, Employee shall be deemed to have suffered physical incapacity or mental incompetence if Employee is unable to perform the essential functions of his/her job with reasonable accommodation as determined in the sole discretion of Mr. Frederic Jouhet or the Board of Directors.  Any accommodation will not be deemed reasonable if it imposes an undue hardship on the Company.  If this Agreement and Employee's employment terminate due to the death or disability of Employee, Employee will not be entitled to any payments after the date of his/her death or disability.

(b)      At the Parties Option.  Employee or Company may terminate this Agreement for any reason by giving at least thirty (30) days' written notice to the other party, provided that the Company may waive Employee's notice requirement in its sole discretion.  In the event of the Employee's termination as set forth in this subparagraph, the Company will have no obligation to pay Employee after his/her last day of active employment any other payments including but not limited to severance or other benefits.

The Employee acknowledges that, upon termination of his/her employment, he/she is entitled to no other compensation, severance, or other benefits other than those specifically set forth in this Agreement.  This relationship is an at-will relationship and can be terminated for any reason subject to the terms and conditions of this Agreement.

7.      **Return of Property**.      Upon any termination of this Agreement and the Employee's employment hereunder, the Employee shall at once deliver to the Company all books, reports, documents, effects, money, securities, computers, tablets, phones, or other property belonging to the Company for which the Company is liable to others that are in the Employee's possession, charge, control, or custody.  The Employee further shall return to or otherwise inform the Company of all means of access to any account, database, or computer system of the Company (whether personal to the Employee or public, published or unpublished, standard or backdoor, including all account names, passwords, access codes, unique personal identification numbers, any code kept secret and any other means allowing employee access to Company's data or documentation).



8.   **Definition**.   In this Agreement the word "person" shall include individuals, partnerships, associations, trusts, unincorporated organizations, and corporations and vice versa.

9.   **Termination of Prior Agreements; Entire Agreement**.   Upon the effective date of this Agreement, any employment agreement between the Employee and Company shall terminate and shall be of no further force or effect, and the Employee will be entitled to no further consideration or compensation thereunder.   This Agreement constitutes the entire agreement between the Employee and the Company with respect to the subject matter hereof and cancels and supersedes any prior understandings and agreements between the Employee and the Company with respect thereto.

10.   **Severability and Construction**.   If any provision of this Agreement is determined to be invalid or unenforceable in whole or in part, such invalidity or unenforceability shall attach only to such provision or part thereof and the remaining part of such provision and all other provisions hereof shall continue in full force and effect.   Moreover, if one or more of the provisions contained in this Agreement shall for any reason be held to be excessively broad as to scope, activity, subject or otherwise so as to be unenforceable at law, such provision or provisions shall be construed by the appropriate judicial body by limiting or reducing it or them so as to be enforceable to the maximum extend compatible with the applicable law as it shall appear.

11.   **Governing Law**.   This Agreement shall be governed by and construed in accordance with the laws of the State of Michigan, without giving effect to the principles of conflicts of law thereof.

12.   **Review of Agreement**.   The Employee acknowledges that he/she has been advised to obtain an attorney regarding a review of this Agreement and has had an opportunity to obtain legal advice in connection with this Agreement.

13.   **Assignment of Rights**.   The Employee shall not have the right to assign this Agreement (it being understood that this is a personal service contract requiring the services of the Employee personally) or any of his/her rights or obligations hereunder, including any subcontracting of obligations hereunder, without the prior written consent of the Company. The rights and obligations of the Company under this Agreement may be assigned by the Company and shall inure to the benefit of, and shall be binding upon, the successors and assign of the Company.

14.   Employee hereby acknowledges that he/she has been advised to obtain counsel and has had counsel review this Agreement prior to his/her execution of this Agreement.

15.   **Notices**:

(a)   Any notice required or permitted to be given under this Agreement will be given in writing by personal delivery, registered mail, or by facsimile.

-4-



If to the Company:

      Macuhealth Distribution, Inc.
      Attn:  Mr. Frederic Jouhet
      280 North Old Woodward, Suite 107
      Birmingham, MI 48009

With a copy to:

      A. Stuart Tompkins, Esq.
      Sullivan, Ward, Asher & Patton, P.C.
      25800 Northwestern Highway, Suite 1000
      Southfield, MI   48037-0222

If to Employee:

      Raquel Davis (Meira)

      █████████████████████

(b)     Any termination by the Company or the Employee shall be communicated by a written notice of termination to the other party hereto delivered in accordance with this Agreement.  Such notice shall indicate the specific termination provision in this Agreement relied upon.

16.     **Waiver; Amendment**.  No provision of this Agreement shall be amended, modified, waived, or discharged unless the modification, waiver, or discharge is agreed to in writing and signed by the Employee and by an officer of the Company (other than the Employee) specifically authorized to do so by the Board of Directors.  No waiver by either party of any breach of, or compliance with, any condition or provision of this Agreement by the other party shall be considered a waiver of any other condition or provision or of the same condition or provision at another time.

17.     **Injunctive Relief**.  The parties hereto agree that a breach of any of the promises or agreements contained herein will result in irreparable and continuing damage to the Company and the Employee for which there will be no adequate remedy at law, and the Company or the Employee shall be entitled, in addition to all other remedies, to injunctive relief and such other relief as may be proper (including monetary damages, if appropriate).

18.     **Captions**.  The captions of the sections of this Agreement are for convenience of reference only and in no way define, limit, or affect the scope of any section of this Agreement.

19.     **Construction**.  The language of all parts of this Agreement shall in all cases be construed as a whole according to its fair meaning and not strictly for or against either party.

RD

20. **Counterparts**.  This Agreement may be executed in counterparts, each of which shall be deemed an original but all of which together will constitute one and the same instrument.

21. **Venue and Jurisdiction**.  Each of the parties to this Agreement agree that this Agreement is made in Michigan and each of the parties submit to the non-exclusive jurisdiction of any state or federal courts sitting in Michigan with respect to any action or proceeding arising out of or relating to this Settlement Agreement may be heard and determined in such court and expressly submits the personal jurisdiction and venue of such court for the purposes of this Settlement Agreement and expressly waives any claim of improper venue and any claim that such courts are an inconvenient forum.

22. **Provisions That Operate Following Termination**.   Notwithstanding any termination of this Agreement and the Employee's employment hereunder for any reason whatsoever, the provisions of Section 6 of this Agreement and any other provision of this Agreement necessary to give efficacy thereto shall continue in full force and effect following such termination.

**MACUHEALTH DISTRIBUTION, INC.**

By:  _____

Its:  _____VP Sales & NBD_____

**EMPLOYEE** _____

AMD-121836/1645609v3

-6-

RD

**Exhibit B**



STATE OF CALIFORNIA | Business, Consumer Services and Housing Agency                                    GAVIN NEWSOM, GOVERNOR

# DEPARTMENT OF FAIR EMPLOYMENT & HOUSING

KEVIN KISH, DIRECTOR

2218 Kausen Drive, Suite 100 I Elk Grove I CA I 95758
(800) 884-1684 (Voice) I (800) 700-2320 (TTY) | California's Relay Service at 711
http://www.dfeh.ca.gov I Email: contact.center@dfeh.ca.gov

June 18, 2019

Raquel Meira Davis
1000 Wilshire Blvd Ste 600
Los Angeles, California 90017

RE:   **Notice of Case Closure and Right to Sue**
       DFEH Matter Number: 201906-06353803
       Right to Sue: Meira Davis / MacuHealth LP et al.

Dear Raquel Meira Davis,

This letter informs you that the above-referenced complaint was filed with the Department of Fair Employment and Housing (DFEH) has been closed effective June 18, 2019 because an immediate Right to Sue notice was requested. DFEH will take no further action on the complaint.

This letter is also your Right to Sue notice. According to Government Code section 12965, subdivision (b), a civil action may be brought under the provisions of the Fair Employment and Housing Act against the person, employer, labor organization or employment agency named in the above-referenced complaint. The civil action must be filed within one year from the date of this letter.

To obtain a federal Right to Sue notice, you must contact the U.S. Equal Employment Opportunity Commission (EEOC) to file a complaint within 30 days of receipt of this DFEH Notice of Case Closure or within 300 days of the alleged discriminatory act, whichever is earlier.

Sincerely,


Department of Fair Employment and Housing

**Exhibit C**

EEOC Form 161-B (11/16)

## U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

## NOTICE OF RIGHT TO SUE *(ISSUED ON REQUEST)*

| To:  Raquel Meira Davis | From: | Los Angeles District Office<br>255 E. Temple St. 4th Floor<br>Los Angeles, CA 90012 |
|---|---|---|

☐ On behalf of person(s) aggrieved whose identity is
CONFIDENTIAL *(29 CFR §1601.7(a))*

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| **480-2019-03535** | **Garrett D. Hoover,**<br>**Intake Supervisor** | **(213) 894-1090** |

*(See also the additional information enclosed with this form.)*

**NOTICE TO THE PERSON AGGRIEVED:**

**Title VII of the Civil Rights Act of 1964, the Americans with Disabilities Act (ADA), or the Genetic Information Nondiscrimination Act (GINA):** This is your Notice of Right to Sue, issued under Title VII, the ADA or GINA based on the above-numbered charge. It has been issued at your request. Your lawsuit under Title VII, the ADA or GINA **must be filed in a federal or state court WITHIN 90 DAYS of your receipt of this notice**; or your right to sue based on this charge will be lost. (The time limit for filing suit based on a claim under state law may be different.)

☐ More than 180 days have passed since the filing of this charge.

☒ Less than 180 days have passed since the filing of this charge, but I have determined that it is unlikely that the EEOC will be able to complete its administrative processing within 180 days from the filing of this charge.

☒ The EEOC is terminating its processing of this charge.

☐ The EEOC will continue to process this charge.

**Age Discrimination in Employment Act (ADEA):** You may sue under the ADEA at any time from 60 days after the charge was filed until 90 days after you receive notice that we have completed action on the charge. In this regard, **the paragraph marked below applies to your case:**

☐ The EEOC is closing your case. Therefore, your lawsuit under the ADEA **must be filed in federal or state court WITHIN 90 DAYS** of your receipt of this Notice. Otherwise, your right to sue based on the above-numbered charge will be lost.

☐ The EEOC is continuing its handling of your ADEA case. However, if 60 days have passed since the filing of the charge, you may file suit in federal or state court under the ADEA at this time.

**Equal Pay Act (EPA):** You already have the right to sue under the EPA (filing an EEOC charge is not required.) EPA suits must be brought in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that **backpay due for any violations that occurred more than 2 years (3 years)** before you file suit may not be collectible.

If you file suit, based on this charge, please send a copy of your court complaint to this office.

On behalf of the Commission

*Rosa M. Viramontes*                    7/1/2019

**Rosa M. Viramontes,**
**District Director**

Enclosures(s)                                                                                          *(Date Mailed)*

cc:
Frederic Jouhet
CEO
MACUHEALTH LP
401 S Old Woodward Ave, Suite 308
Birmingham, MI 48009

Zainah Alfi
EXCELSIS LAW PC
1000 Wilshire Blvd. Ste 600
Los Angeles, CA 90017

**Exhibit D**



June 2, 2015

# Offer of Employment

To:     Raquel Meira,

Raquel, we are pleased to offer you the position of Supplement Sales Specialist reporting directly to me for the Northern California Territory consisting of NorCal, NV (excluding greater Las Vegas) and Hawaii.  You will have the responsibility to develop and grow our MacuHealth® with LMZ3 brand along with SightRisk™ in eye care professionals' offices and to their patients throughout the territory.

The terms and conditions of your employment are as follows:

1.  This offer is for full time exempt employment with a start date of June 22, 2015.
2.  Base salary of $62,000 per annum payable bimonthly on the 15th and last day of each month. This base salary includes an allowance to purchase a car.
3.  Participation in our commission plan. Currently the plan for MacuHealth is: ███████ bottle sold up to ███████████████████████ ███████ bottle sold incremental to your base number (2015 Growth Commission). Base commissions (███ per bottle) on all bottles starting from bottle one sold are paid at the end of each month for the prior month's unit sales. Growth commissions (additional ████ per bottle) are calculated and paid at the end of each quarter. Growth commissions are calculated on a quarterly basis to minimize monthly spikes and seasonal changes to the business. Commission plans are reviewed annually and subject to change.
4.  Total MacuHealth bottles sold in this territory for 12-months ending December 31, 2014 is ████ █████████████████████████████████.
5.  Commission for Sight Risk sales (once launched) are █████ or every program sold.
6.  Participation in all other Company incentive and award programs that may be from time to time introduced.
7.  Participation in company defined benefit plan based on eligibility. We currently offer a medical/dental/vision care plan. Other benefits may become available down the road as the company grows.



8. Pay for all out-of-pocket travel and entertainment expenses based on company guidelines, including mileage at standard IRS rates and for any business portion of your cell phone and high speed Internet expenses. The company will provide a laptop computer.
9. Vacation  and PTO will be commensurate with company policy.
10. An employment agreement will be created for you to sign. The main component of this Agreement is that while working for MacuHealth, you will be restricted from selling or promoting any other vitamins/supplements.
11. Adherence to company policies with regard to conduct, reporting and travel.

Raquel, please review this offer and sign below if it is accepted. We look forward to you joining our team and to your personal success in helping make MacuHealth and SightRisk market leaders.

With kind regards,

David Israel
Vice President of Sales and New Business Development

I hereby accept this offer of employment on _____.
                                                                                    date

Signed: _____

Print Name: _____